UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| KEITH JEROME WRIGHT,<br><br>Plaintiff,<br><br>v.<br><br>IDALBERTO ZALDIVAR-GALVES,<br><br>Defendant. | Case No. 1:24-cv-01029-JLT-EPG (PC)<br><br>FINDINGS AND RECOMMENDATIONS, RECOMMENDING THAT:<br><br>PLAINTIFF'S MOTION TO STRIKE BE DENIED<br><br>(ECF No. 46)<br><br>DEFENDANT'S MOTION FOR SUMMARY JUDGMENT BE GRANTED<br><br>(ECF No. 45)<br><br>OBJECTIONS, IF ANY, DUE WITHIN THIRTY DAYS |

Plaintiff Keith Jerome Wright is a state prisoner proceeding *pro se* and *in forma pauperis* with this civil rights action pursuant to 42 U.S.C. § 1983.[1]

This case proceeds on Plaintiff's claim that his Eighth Amendment right to be from deliberate indifference to serious medical needs was violated when Defendant Dr. Idalberto Zaldivar-Galves was aware of but failed to properly and timely treat a rotator cuff tear in Plaintiff's left shoulder. (ECF No. 1).

Plaintiff moves the Court to strike Defendant's Supplemental Responses to Plaintiff's First Set of Requests for Production of Documents and Things as untimely. (ECF No. 46).

---

[1] The action was reassigned to the undersigned on October 3, 2025. (ECF No. 44).

1

Defendant also moves the Court for summary judgment, arguing that the evidence shows that he was not deliberately indifferent to Plaintiff's serious medical needs and that he is entitled to qualified immunity. (ECF No. 45).

For the reasons explained below, the Court recommends Plaintiff's motion to strike be denied and Defendant's motion for summary judgment be granted.

## I.        PLAINTIFF'S COMPLAINT[2]

Plaintiff is an inmate at the California Substance Abuse Treatment Facility ("SATF"). (ECF No. 1 at 1-2). Defendant is a physician and served as Plaintiff's primary care provider "for approximately 5 months," when Plaintiff filed the underlying complaint against Defendant. (*Id.* at 7). Plaintiff alleges that "Defendant…was aware that Plaintiff was in severe pain based on his rotator cuff tear on the left side [shoulder], and he was aware of the serious medical risks that Plaintiff would be exposed to for ignoring, denying, and delaying medical treatment for the severe pain." (*Id.*). Plaintiff alleges that "his clavicle bone was poking out of his shoulder" and "Defendant knew of Plaintiff's medial condition…but took no action to ensure that Plaintiff received a consultation with an orthopedist" or otherwise "provide Plaintiff access to a physician competent to evaluate his left shoulder." (*Id.*). Plaintiff asserts that "Defendant ignored his complaints." (*Id.* at 8).

Plaintiff alleges that "Defendant['s] lengthy delay of 5 months has caused Plaintiff's left shoulder to be in severe pain." (*Id.* at 7). "Defendant failed to provide proper medical attention needed to properly diagnose fully…Plaintiff's injuries" and "failed to consider arthroscopic surgery with decompression, distal clavicle resection, and rotator cuff repair" and "continues to fail to refer Plaintiff to an orthopedist," which has "affected Plaintiff's daily activities and that the lack of treatment exposed Plaintiff to the risk of temporary and permanent damage to his left shoulder." (*Id.* at 8, 10).

Plaintiff contends that "Defendant violated Plaintiff's Eighth Amendment rights by causing cruel and unusual punishment with lack of medical care, delayed Plaintiff's access to medical attention…that has led to Plaintiff's disability and continuing his severe pain with his left

---

[2] For readability, minor alterations to some quoted excerpts have been made, such as to spelling and punctuation, without noting each alteration.

shoulder." (*Id.* at 8).

On October 10, 2024, the Court screened the complaint and found that Plaintiff had "raised a viable Eighth Amendment deliberate indifference to serious medical need claim against Defendant Zaldivar-Galves." (ECF No. 13 at 5).

### II.     THE PARTIES' MOTIONS

#### A.   Defendant's Motion for Summary Judgment

Defendant filed a motion for summary judgment on October 16, 2025. (ECF No. 45). Defendant argues that he was not deliberately indifferent to Plaintiff's serious medical needs and that he is entitled to qualified immunity. (*Id.* at 2-3). Defendant supports his motion for summary judgment with the following: (1) a Statement of Undisputed Facts, (2) declarations from Defendant and from fact witness, Nurse Andrade-Sanchez, and (3) excerpts and images from Plaintiff's medical records, which were attached to the declarations of Defendant and Nurse Andrade-Sanchez. (ECF Nos. 45-1 through 45-8).

Plaintiff filed his opposition to Defendant's motion for summary judgment on November 3, 2025. (ECF No. 47). Plaintiff supports his opposition with the following: (1) his response to Defendant's Statement of Undisputed Facts, (2) a Statement of Further Disputed Facts, (3) Plaintiff's declaration, (4) excerpts of Plaintiff's medical records including x-ray and MRI images, and (5) undated photos of unidentified people. (*Id.* at 6-75).

On November 17, 2025, Defendant filed his reply brief to Plaintiff's opposition to summary judgment. (ECF No. 50).

#### B.   Plaintiff's Motion to Strike

After Defendant filed his motion for summary judgment (ECF No. 45), Plaintiff filed a Notice and Motion to Strike Defendant Zaldivar-Galves' Supplemental Responses to Plaintiff's First Set of Requests for Production of Documents and Things (ECF No. 46). In his motion to strike, Plaintiff seeks to "exclude all attached [supplemental] documents that Defendant wants to use for summary judgment purposes." (*Id.* at 3). Defendant filed his opposition to the motion to strike on November 21, 2015 and attached a declaration from defense counsel. (ECF No. 51). On December 9, 2025, Plaintiff filed his reply brief in response to Defendant's opposition to strike. (ECF No. 52).

In considering the briefing, the Court ordered Defendant to supplement his opposition to Plaintiff's motion to strike by "describing what efforts were made to comply with Defendant's Rule 37 requirements as well as any other information relevant to whether Defendant acted with bad faith or willfulness in not timely disclosing the documents at issue in Plaintiff's motion." (ECF No. 54 at 2). The Court also ordered Defendant to submit his written responses to Plaintiff's Requests for Production of Documents. (*Id.*).

On March 13, 2025, Defendant filed his supplemental brief, which also included a declaration from defense counsel. (ECF No. 55). Defendant filed the 40 pages of supplemental medical records, which included Plaintiff's Progress Notes, Final Reports from MRI Shoulder Left Arthrogram signed on March 26, 2024, April 17, 2024, July 1, 2024, and September 25, 2024, x-ray images from Plaintiff's left shoulder taken on March 26, 2024, and MRI images of Plaintiff's left shoulder taken May 21, 2024 and September 25, 2024. (ECF No. 55-2 at 6-45).

To date, Plaintiff has not filed a response to the supplement.

### III.     ANALYSIS OF PLAINTIFF'S MOTION TO STRIKE

Because it concerns the evidence that may be considered in connection with Defendant's motion for summary judgment, the Court first addresses Plaintiff's motion to strike before turning to Defendant's summary judgment motion.

In the motion to strike, Plaintiff argues that the "deadline for the filing of [non-expert] discovery [was extended] for fourteen days, up to July 24, 2025" and therefore "[t]he deadline for discovery expired July 24." (ECF No. 46 at 3). Defendant submitted his supplemental discovery responses on October 13, 2025, and Plaintiff argues that these supplemental responses are untimely and should be stricken so that Defendant cannot use them in support of his motion for summary judgment. (*Id.*).

In response, Defendant argues that "in preparing Defendant's summary judgment motion, defense counsel discovered additional medical records which were responsive to Plaintiff's discovery requests and, pursuant to the Federal Rules of Civil procedure, immediately served the supplemental responses on Plaintiff." (ECF No. 51 at 2 (citing ECF No. 51-1 at 2)).

In reply, Plaintiff argues that "[t]his allegedly supplemental evidence was available to Defendant's counsel for longer than [seven] (7) months…[and] this evidence was not served in a

4

timely manner…because this supplemental evidence was served to the Court only to support the Defendant's summary judgment." (ECF No. 52 at 2 (emphasis omitted)). Plaintiff argues that "Defendant's counsel's actions amount to 'malfeasance.'" (*Id.*).

In the supplement to his opposition brief, Defendant states that he served his discovery responses on August 20, 2025, and "all of the documents produced were from Plaintiff's own medical records," which "totaled 1499 pages." (*Id.*). "When drafting the summary judgment motion, defense counsel discovered additional medical records…[and] in an abundance of caution, counsel served those records on Plaintiff as supplemental responses to Plaintiff's first set of requests for production of documents…[and] were served on October 13, 2025…." (*Id.*). Defendant also filed the 40 pages of supplemental medical records, which included Plaintiff's Progress Notes, Final Reports from MRI Shoulder Left Arthrogram signed on March 26, 2024, April 17, 2024, July 1, 2024, and September 25, 2024, x-ray images from Plaintiff's left shoulder taken on March 26, 2024, and MRI images of Plaintiff's left shoulder taken May 21, 2024 and September 25, 2024. (ECF No. 55-2 at 6-45). Defendant argues that (1) the supplemental documents are not subject to sanctions under Fed. R. Civ. P. 37(c) because "that information was not provided pursuant to Rules 26(a) and 26(e)"; (2) supplemental disclosure was an "accidental error made by defense counsel which did not cause Plaintiff any harm or prejudice; and (3) excluding "this relevant evidence amounts to an abuse of discretion." (*Id.* at 3-5).

Federal Rule of Civil Procedure 37 provides for sanctions against a party who "fails to obey an order to provide or permit discovery." *Leon v. IDX Sys. Corp.,* 464 F.3d 951, 958 (9th Cir. 2006) (citation omitted). Pursuant to Fed. R. Civ. P. 37(c), a party who fails to provide information as required by Rules 26(a) and 26(e) is not allowed to use that information to supply evidence on a motion, at a hearing, or at trial, unless the failure was substantially justified or is harmless. *See* Fed. R. Civ. P. 37(c)(1). In addition to or instead of prohibiting such use, the court, on motion and after giving an opportunity to be heard may impose other appropriate sanctions. *See* Fed. R. Civ. P. 37(c)(1).

Among the factors that may properly guide a district court in determining whether a violation of a discovery deadline is justified or harmless are: (1) prejudice or surprise to the party against whom the evidence is offered; (2) the ability of that party to cure the prejudice; (3) the

likelihood of disruption of the trial; and (4) bad faith or willfulness involved in not timely disclosing the evidence. *Lanard Toys Ltd. v. Novelty, Inc.*, 375 Fed. Appx. 705, 713 (9th Cir. 2010) (involving untimely disclosure of expert report under Rule 26(a)(2)(B)) (citing *David v. Caterpillar, Inc.*, 324 F.3d 851, 857 (7th Cir. 2003)). District courts have "particularly wide latitude ... to issue sanctions under Rule 37(c)(1)." *Yeti By Molly, Ltd. v. Deckers Outdoor Corp.*, 259 F.3d 1101, 1106 (9th Cir. 2001). It is the non-disclosing party's burden to prove that its failure to comply with Rule 26 was "substantially justified" or is "harmless." *Id.* at 1107.

Here, Defendant provided the supplemental production of documents approximately a month and a half after the non-expert deadline had passed, rendering his supplement untimely.[3]

The Court turns to whether the violation of a discovery deadline is justified or harmless. In considering the first element of prejudice or surprise to the Plaintiff, Defendant stated that the supplemental discovery documents were pages from Plaintiff's medical records, and Plaintiff has access to his own medical records. *See Cole v. Adam*, No. 17-05691 BLF (PR), 2019 WL 1048251, at *5, n3 (N.D. Cal. Mar. 4, 2019) ("prisoners have a right of access to their own medical files") (citing Cal. Health & Safety Code §§ 123100-123149.5). In reviewing Defendant's supplemental briefing and attachments, the additional documents appear to be Progress Notes, Final Reports reading MRI results for Plaintiff's left shoulder and x-ray and MRI images taken of Plaintiff's left shoulder. Plaintiff was aware that the MRI and x-ray images existed and that he attended certain doctor's appointments because he participated in those encounters.

As to prejudice, Plaintiff has not argued that he would have taken discovery depositions, requested additional information, or otherwise taken additional steps if he had the supplemental

---

[3] As an initial matter, Defendant argues that Fed. R. Civ. P. 26(a) and 26(e) do not "apply to the situation at bar" and therefore, Fed. R. Civ. P. 37 is not implicated. (ECF No. 55 at 3). Defendant argues that the supplemental documents were not provided to supplement his initial disclosures, expert testimony, or pretrial disclosures pursuant to Fed. R. Civ. P. 26(a). (*Id.*). Defendant also argues that "he provided the information as soon as it was discovered and supplemented his responses as required by Rule 26(e)…and his actions are not barred by Rule 37." (*Id.*). However, it is undisputed that the non-expert discovery deadline was September 2, 2025, and that Defendant did not supplement his discovery responses until October 13, 2025, just three days before filing his motion for summary judgment. As such, Defendant's supplemental discovery responses were untimely.

documents prior to the September 2, 2025 discovery deadline. Therefore, the Court finds no surprise or prejudice to Plaintiff.

Further, there is no trial date set in the case so there is no concern for disruption of the trial proceedings.

Finally, the Court finds no bad faith or willfulness in not timely supplementing discovery responses. Defense counsel makes a sworn statement that counsel made "an inadvertent error…when reviewing the records" and "discovered additional documents which I had missed the first time I reviewed Plaintiff's medical records" and tried "to rectify my mistake as soon as it was discovered" by supplementing Defendant's responses to Plaintiff's requests for production of documents. Defendant provided nearly 1,500 pages of medical records, and the failure to timely produce an additional 40 pages does not appear willful or in bad faith.

Considering the Court has found no bad faith or willfulness, no prejudice to the Plaintiff for the delayed production, and no disruption to trial proceedings, Defendant's failure to comply with Rule 26 was "harmless." *Yeti by Molly, Ltd..*, 259 F.3d at 1107.

Accordingly, the Court will recommend the Plaintiff's motion to strike be denied.

## IV.    ANALYSIS OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

### A.  Applicable Legal Standards

#### i. Summary Judgment

Summary judgment in favor of a party is appropriate when there "is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Albino v. Baca*, 747 F.3d 1162, 1169 (9th Cir. 2014) (*en banc*) ("If there is a genuine dispute about material facts, summary judgment will not be granted."). A party asserting that a fact cannot be disputed must support the assertion by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials, or showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1).

A party moving for summary judgment "bears the initial responsibility of informing the

7

district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)). "Where the non-moving party bears the burden of proof at trial, the moving party need only prove that there is an absence of evidence to support the non-moving party's case." *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 387 (9th Cir. 2010). If the moving party does so, "the burden then shifts to the non-moving party to designate specific facts demonstrating the existence of genuine issues for trial," which is not a light burden, and the non-moving party "must come forth with evidence from which a jury could reasonably render a verdict in the non-moving party's favor." *Id.*; *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986) ("The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff."). "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex*, 477 U.S. at 322. Additionally, "[a] summary judgment motion cannot be defeated by relying solely on conclusory allegations unsupported by factual data." *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989).

In reviewing the evidence at the summary judgment stage, the Court "must draw all reasonable inferences in the light most favorable to the nonmoving party." *Comite de Jornaleros de Redondo Beach v. City of Redondo Beach*, 657 F.3d 936, 942 (9th Cir. 2011). The Court need only draw inferences, however, where there is "evidence in the record . . . from which a reasonable inference . . . may be drawn"; the Court need not entertain inferences that are unsupported by fact. *Celotex*, 477 U.S. at 330 n. 2 (citation omitted). And "[t]he evidence of the non-movant is to be believed." *Anderson*, 477 U.S. at 255. In reviewing a summary judgment motion, the Court may consider other materials in the record not cited to by the parties but is not required to do so. Fed. R. Civ. P. 56(c)(3); *Carmen v. San Francisco Unified School Dist.*, 237 F.3d 1026, 1031 (9th Cir. 2001).

### ii. Deliberate Indifference to Serious Medical Needs

"[T]o maintain an Eighth Amendment claim based on prison medical treatment, an inmate

8

must show 'deliberate indifference to serious medical needs.'" *Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006) (quoting *Estelle v. Gamble*, 429 U.S. 97, 104 (1976)). This requires Plaintiff to show (1) "a serious medical need by demonstrating that failure to treat a prisoner's condition could result in further significant injury or the unnecessary and wanton infliction of pain," and (2) that "the Defendant's response to the need was deliberately indifferent." *Id.* (quoting *McGuckin v. Smith*, 974 F.2d 1050, 1059-60 (9th Cir. 1992)) (citation and internal quotation marks omitted), *overruled on other grounds by WMX Technologies v. Miller*, 104 F.3d 1133 (9th Cir. 1997) (*en banc*).

The "second prong—defendant's response to the need was deliberately indifferent—is satisfied by showing (a) a purposeful act or failure to respond to a prisoner's pain or possible medical need and (b) harm caused by the indifference." *Jett*, 439 F.3d at 1096 (citation omitted). Thus, deliberate indifference is established only where the defendant *subjectively* "knows of and disregards an *excessive risk* to inmate health and safety." *Toguchi v. Chung*, 391 F.3d 1051, 1057 (9th Cir. 2004) (emphasis added) (citation and internal quotation marks omitted). Civil recklessness (failure "to act in the face of an unjustifiably high risk of harm that is either known or so obvious that it should be known") is insufficient to establish an Eighth Amendment violation. *Farmer v. Brennan*, 511 U.S. 825, 836-37 & n.5 (1994) (citations omitted).

Additionally, a difference of opinion between an inmate and prison medical personnel—or between medical professionals—regarding appropriate medical diagnosis and treatment is not enough to establish a deliberate indifference claim. *Sanchez v. Vild*, 891 F.2d 240, 242 (9th Cir. 1989); *Toguchi*, 391 F.3d at 1058. Additionally, "a complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment. Medical malpractice does not become a constitutional violation merely because the victim is a prisoner." *Estelle*, 429 U.S. at 106. To establish a difference of opinion rising to the level of deliberate indifference, a "plaintiff must show that the course of treatment the doctors chose was medically unacceptable under the circumstances." *Jackson v. McIntosh*, 90 F.3d 330, 332 (9th Cir. 1996), *overruled in part on other grounds by Peralta v. Dillard*, 744 F.3d 1076 (9th Cir. 2014) (*en banc*).

\\\

9

## B. Summary of the Parties' Arguments

Defendant argues that "when Plaintiff first went to the medical center at SATF regarding his shoulder, he did not see Defendant." (ECF No. 45 at 2). Instead, "Plaintiff was…seen by the Registered Nurse [Andrade-Sanchez] on duty, who did not notice any deformities in Plaintiff's shoulder, but sent him to get an x-ray to determine the extent of his injury." (*Id.*). Defendant argues that the "results of the x-ray showed that Plaintiff's shoulder was not dislocated and was not fractured. Therefore, Defendant was not aware of any injury to Plaintiff's shoulder and thus did not possess the requisite mental culpability required for an Eighth Amendment violation." (*Id.* at 2-3).

Defendant also argues that "medical records establish that at no time did Defendant deny Plaintiff medical treatment – in fact, Defendant ordered Plaintiff to be transferred to a higher level of care as soon as he was aware of the injury and then continued to see Plaintiff on a regular basis to discuss the injury and Plaintiff's treatment plan." (ECF No. 45 at 2).

Finally, Defendant asserts that he is entitled to qualified immunity "as it was not clear to him that, at the time of the incident, the actions he took in evaluating Plaintiff, referring Plaintiff to higher level of care, and following up with Plaintiff's regular consultations to ensure Plaintiff's treatment plan was in place and being effectuated would violate Plaintiff's constitutional rights." (*Id.* at 3).

In opposition, Plaintiff argues that Defendant was deliberately indifferent to his serious medical needs because Defendant "knew the extent of Plaintiff's injuries" but "for 11 months failed to do anything for Plaintiff's shoulder, preventing atrophy." (ECF No. 47 at 3). "Defendant's methods of treatment were the duplication of appointments that constituted diagnoses and not treatment" causing Plaintiff "to suffer through three (3) x-rays, two (2) MRIs, physical therapy consultation and then physical therapy," which were "spread out from two to four months apart [and] all amounted to the same conclusion that the [Plaintiff] needed surgery." (*Id.*). "Defendant knew the extent of Plaintiff's injuries and did nothing to prevent the wanton pain and atrophy Plaintiff suffered." (*Id.*).

Plaintiff further argues that "Defendant is a surgeon with knowledge of atrophy and the course of treatment he chose was medically unacceptable under the circumstances, [and] by not

doing [anything] for the 7-months, [he] chose this course in conscious disregard of the excessive harm to Plaintiff." (*Id.* at 4).

As to qualified immunity, Plaintiff argues it does not apply because "it was clearly established that prison medical officials could not delay treatment of an inmate's serious medical needs, continue to supply only ineffective treatment, or refuse treatment for unacceptable or non-medical reasons." (*Id.* at 4).

In his reply brief, Defendant re-states the argument from his motion that Defendant met with Plaintiff six times to address his injury and pain, ordered various imaging studies to determine the cause of Plaintiff's pain and extent of damage in his shoulder, sent him to orthopedic and emergency medicine specialists to develop a specific and effective care plan, and ordered a steroid injunction, Naproxen medication, and topical cream to mitigate Plaintiff's pain. (ECF No. 50).

### C. Undisputed Facts[4]

Accordingly, the Court finds that the following relevant facts are undisputed:

On March 26, 2024, Plaintiff went to the medical clinic at SATF due to pain in his left shoulder. (DSUF[5] 2). Plaintiff was seen by Registered Nurse Andrade-Sanchez. (DSUF 3). Nurse Andrade-Sanchez entered an order for an immediate x-ray of Plaintiff's left shoulder due to "left shoulder pain." (ECF No. 45-4 at 23). She also prescribed Tylenol for pain. (ECF No. 45-5 at 5). Plaintiff was not seen by Defendant. (*Id.*).

The same day, Dr. B. Brown signed the report of x-ray findings indicating "no acute fracture or dislocation. No significant osteoarthritis. No suspicious radiopaque foreign body" and included an impression of "no acute osseous abnormality." (ECF No. 45-7 at 5).

On April 17, 2024, Dr. Bashir Akhavan Tafti signed his Final Report indicating his impression from Plaintiff's shoulder x-ray as "No radiographic evidence of acute osseous injuries or dislocations. Degenerative changes of the humeral greater tubercle suggestive of (but not conclusive for) rotator cuff tendinopathy or prior shoulder dislocations. If clinically indicated, this

---

[4] Defendant filed his Separate Statement of Undisputed Facts. (ECF No. 45-8). Plaintiff responded in his opposition brief by agreeing to certain proposed undisputed facts and denying others. (ECF No. 47 at 6-8). Plaintiff and Defendant submitted excerpts of Plaintiff's medical records as attachments to declarations.

[5] "DSUF" refers to Defendant's Statement of Undisputed Facts as agreed by Plaintiff.

can be better evaluated with MRI." (ECF No. 45-4 at 25).

On April 17, 2024, Defendant met with Plaintiff "for follow-up and evaluation of left shoulder pain…related [to] a fall that happened about 3 weeks ago during a basketball game. X-ray was obtained and it was informed as normal." (ECF No. 45-4 at 11; DSUF 7; *see* ECF No. 47 at 6). The Progress Note states that "[s]ince then, patient has been reporting episodes of tingling and numbness of the left upper arm, and very limited range of motion. Pain is moderate to severe intensity, exacerbated by movement. He is taking NSAIDs for pain…[and] requesting alternative evaluation and treatment." (ECF No. 45-4 at 11). The Progress Note further states that "[d]uring evaluation today, [Plaintiff] was found to have a dislocation of the left shoulder." (ECF No. 45-4 at 11, 24; DSUF 8).

That same day, Defendant referred Plaintiff to the emergency room at Bakersfield Adventist Health hospital and ordered urgent transfer to a higher level of care. (ECF No. 45-4 at 11; DSUF 8, 9).

Plaintiff received another x-ray while at the emergency department at Adventist Health in Bakersfield. (DSUF 10; *see* ECF No. 47 at 6).

The next week, on April 22, 2024, Defendant met with Plaintiff as a "follow-up after emergency room visit." (ECF No. 45-4 at 10; DSUF 11). Defendant's Assessment/Plan section of the Progress Notes says:

> AC Joint Derangement
> Seen and evaluated at hospital. 2 xray[s] have failed to diagnose an evident deformity of the shoulder. He was sent back to Institution with a recommendation for MRI. ER physician considered an AC joint separation. It was reported in the xray. Will obtain an MRI, then will see for no continue with the same plan. Naproxen added for pain.
>
> Left Shoulder Pain
> As above.
> Ordered:
> Diclofenac topical and naproxen.

(ECF No. 45-4 at 10).

The same day, Defendant ordered a follow-up MRI of Plaintiff's left shoulder due to pain for three to four weeks after "injury during basketball practices. Evaluated at ER due to severely decreased rom [range of motion] and deformity. AC joint separation as per Xray. Need MRI,

12

unclear diagnosis since it was not reported." (*Id.* at 21; DSUF 12; *see* ECF No. 47 at 7). No other action was taken at this time, as Plaintiff's MRI was scheduled to take place on May 21, 2024. (DSUF 14).

On April 24, 2024, Defendant again ordered an MRI, this time without contrast, of Plaintiff's left shoulder. (ECF No. 45-4 at 20).

On May 17, 2024, Defendant met with Plaintiff for "follow-up after intra-articular steroid injection [that] happened about a week ago." (ECF No. 45-4 at 9). "He…is scheduled for MRI, which will be done in 5 days…will follow-up [with] him as needed or for discussion of the MRI results." (*Id.*).

Plaintiff received a follow-up MRI without contrast on May 21, 2024. (DSUF 15). The same day, Dr. R. Waters signed a report of the MRI without contrast of Plaintiff's left shoulder. (ECF No. 45-7 at 4). The Impression indicated findings of:

1. Full-thickness rotator cuff tear.
2. Longitudinal split tear of the biceps tendon.
3. Torn superior labrum.
4. Grade 3 AC joint separation.
5. Nonspecfic capsular thickening.

(*Id.*).

On June 3, 2024, Defendant met with Plaintiff for a "follow-up after MRI of the left shoulder … as part of a workup for left shoulder pain, post injury." (ECF No. 45-4 at 6; DSUF 17). The Progress Note states that Defendant's Assessment/Plan included a referral "for orthopedic evaluation due to complexity of the case. Steroid intraarticular injection is helping [Plaintiff] with the pain. Continue same plan for now. Advised regarding … the length of the time to be evaluated by orthopedic. Pending approval." (ECF No. 45-4 at 8). During this appointment, Defendant placed a request for Plaintiff to receive an orthopedic evaluation. (DSUF 18; ECF No. 45-4 at 8; ECF No. 45-5 at 2).

On June 28, 2024, Plaintiff saw orthopedic specialist, Dr. Jose Roberto Bosque. (DSUF 19). Dr. Bosque signed his final report including his assessment of Plaintiff and Dr. Bosque's recommended plan. (ECF No. 45-7 at 6-8). Dr. Bosque reviewed the images of Plaintiff's left shoulder and conducted a physical examination of the Plaintiff. (*Id.*). Dr. Bosque disagreed with

the radiologists who found a full-thickness rotator cuff tear and determined instead that Plaintiff had a partial thickness tear. (*Id.* at 7; DSUF 20). Dr. Bosque recommended a "trial of conservative management" because he believed "it's early. We can still try to rehab through this." (ECF No. 45-7 at 6-8). He then recommended that Defendant "start physical therapy for rotator cuff rehab and AC separation protocol." (*Id.*; DSUF 20).

Dr. Bosque requested an MRI with better image quality to determine whether Plaintiff has a full or partial thickness tear. (ECF No. 45-7 at 6-8). Dr. Bosque noted that repair of a full-thickness tear is a "totally different surgery than AC reconstruction." (*Id.*). Dr. Bosque did not recommend surgery at that time. (DSUF 20). Instead, he recommended follow up in four months "by which point in time, [Plaintiff] hopefully had done some therapy, rehabbed a little bit. We will have a better idea what the AC joint is feeling like, and then we can confirm with a new MRI arthrogram." (ECF No. 45-7 at 6-8).

On July 2, 2024, Defendant met with Plaintiff "for follow-up after orthopedic evaluation … due to AC joint separation and rotator cuff tear." (ECF No. 45-4 at 4; DSUF 21). The same day, Defendant submitted a request to radiology for an MRI, noting that the "images were unclear for the Orthopedic, who is requesting Arthrogram for further work up." (ECF No. 45-4 at 19; DSUF 22). Defendant also submitted a consult request to Physical Therapy Outpatient for evaluation and treatment. (ECF No. 45-5 at 2; DSUF 22).

Plaintiff's consultation with physical therapy was completed on August 23, 2024. (DSUF 23). The same day, Defendant ordered physical therapy one time per week for four weeks for left shoulder pain, to take place within 46-90 days. (ECF No. 45-4 at 14; DSUF 24).

On September 4, 2024, Defendant ordered an MRI Arthrogram of Plaintiff's left shoulder. (ECF No. 45-4 at 17). Defendant noted in the order that the reason for the MRI included "AC joint separation and rotator cuff tear, images were unclear for Orthopedic, who is requesting Arthrogram for further work up. Pain, limited ROM [range of motion], failure of NSAIDs, activity modification and PT [physical therapy]." (*Id.*).

On September 5, 2024, Defendant re-submitted the MRI order. (*Id.* at 14-15). The Order comment indicates that the MRI was "not completed 9/4/24 due to no tech available." (*Id.* at 15).

Plaintiff received a follow-up MRI with contrast on September 25, 2024. (DSUF 25). That

14

day, Dr. Krishna Rao Kylasa signed the Final Report for the MRI Shoulder Left Arthrogram conducted that day. (ECF No. 45-7 at 2). The Impression states:

1. Small partial thickness tearing of the distal supraspinatlus and infraspinatus in the interstitial portion and of the distal supraspinatus at the trim rent tear region. No large partial thickness tear or complete thickness rotator cuff tear.
2. Type III AC joint separation with a moderate amount of fluid at this level and inflammatory changes. Mild AC joint arthropathy.
3. Mild glenohumeral joint arthropathy.
4. Intact labrum.

(*Id.* at 2-3).

On September 26, 2024, Defendant had an appointment with Plaintiff. (DSUF 27). Defendant's Progress Note indicates that Plaintiff "has been schedule[d] to see me today. The visit cannot be executed since the patient has a lawsuit against me…the patient is rescheduled with another provider." (ECF No. 45-4 at 2; DSUF 27).

### D. Analysis

It is undisputed that Plaintiff's left shoulder injury was a serious medical need. The Court turns to the second prong of the Eighth Amendment deliberate indifference analysis, which considers Defendant's response to this serious medical need.

After reviewing the undisputed facts and medical records, the Court recommends finding that Defendant has met his initial burden of identifying evidence that demonstrates the absence of a genuine issue of material fact.

That evidence shows that Defendant took reasonable steps to respond to Plaintiff's injury and pain. Defendant had six appointments with Plaintiff over a five-month period in 2024, including April 17, April 22, May 17, June 3, July 2, and September 26. More importantly, Defendant acted upon the information gathered at these appointments. At their first appointment, Defendant diagnosed Plaintiff's shoulder as dislocated and sent him to the emergency room on April 17 to receive a higher level of care, including another x-ray of his left shoulder. The emergency room "failed to diagnose an evidence deformity of the shoulder," but the emergency room physician "considered an AC joint separation" and sent Plaintiff "back to [the] Institution with a recommendation for MRI." (ECF No. 45-4 at 10).

Defendant then ordered the MRI as recommended at Plaintiff's emergency room in a

follow-up visit on April 22, 2024. (*Id.* at 21; DSUF 12; *see* ECF No. 47 at 7). On April 24, 2024, Defendant again ordered an MRI, this time without contrast, of Plaintiff's left shoulder. (ECF No. 45-4 at 20). Plaintiff's MRI was scheduled to take place on May 21, 2024. (DSUF 14).

On June 3, 2024, Defendant met with Plaintiff for a "follow-up after MRI of the left shoulder." (ECF No. 45-4 at 6; DSUF 17). The same day, Defendant also referred Plaintiff to a specialist "for orthopedic evaluation due to complexity of the case" and "advised regarding … the length of the time to be evaluated by orthopedic. Pending approval." (DSUF 18; ECF No. 45-4 at 8; ECF No. 45-5 at 2).

On June 28, 2024, the specialist, Dr. Bosque, disagreed with the radiologists and believed Plaintiff had experienced a partial thickness rotator cuff tear instead of a full tear. Dr. Bosque specifically ruled out surgery at that time and recommended a conservative treatment plan of physical therapy, additional MRI studies, and follow up in four months. (ECF No. 45-7 at 6-8 ("trial of conservative management" because "it's early. We can still try to rehab through this…start physical therapy for rotator cuff rehab and AC separation protocol… then we can confirm with a new MRI arthrogram"); DSUF 20 ("Dr. Bosque did not recommend surgery at that time.")).

The MRI with contrast on September 25, 2024 confirmed that Plaintiff had experienced a "[s]mall partial thickness tearing." (ECF No. 45-7 at 2-3).

Defendant again followed the specialist's treatment plan and placed orders for physical therapy, additional MRIs, and further follow-up appointments with Plaintiff. Defendant also took steps to relieve Plaintiff's pain including ordering a sling, an intra-articular steroid injection, Naproxen medication, and topical cream.

Moreover, there is no evidence that Defendant was aware of the need for additional care yet disregarded the need and allowed an excessive risk to Plaintiff's health and safety.

Thus, Defendant has met his evidentiary burden, and the burden shifts to Plaintiff to demonstrate a genuine issue of material fact for trial on Plaintiff's claim of deliberate indifference to serious medical need.

In opposition to summary judgment Plaintiff submitted his declaration, which makes only two assertions regarding Defendant: (1) "Defendant failed to perform a physical examination,"

and (2) "Defendant took three months for the 2nd MRI and four months for physical therapy after the orthopedic recommended it." (ECF No. 47 at 24).

Plaintiff's conclusory statements are not supported by the evidence in the case. Instead, at each of Plaintiff's six visits, the Progress Notes indicate the results of Defendant's physical examination. (*see e.g.,* ECF No. 45-4 at 12). Moreover, Defendant also referred Plaintiff to orthopedic and emergency medicine specialists and ordered testing that examined Plaintiff's shoulder and reported the results to Defendant.

As to Plaintiff's argument concerning the timing of the second MRI and physical therapy, medical records indicate that Defendant ordered the second MRI on July 2, 2024, four days after the orthopedic specialist recommended it. (ECF No. 45-4 at 19). That same day, July 2, Defendant also submitted a consult request to Physical Therapy Outpatient for evaluation and treatment. (ECF No. 45-5 at 2).

As to the remaining documents submitted in opposition to summary judgment, the Court notes that Defendant stopped treating Plaintiff on September 26, 2024, and as such, the Court will limit its review of the evidence to March 2024 through September 2024.First, Plaintiff submitted a series of Health Care Services Request Forms for the following dates: April 2, 2024; May 7, 2024; June 17, 2024; June 30, 2024; September 6, 2024; and September 18, 2024. (ECF No. 47 at 34-45). While Plaintiff does not make a specific argument related to each request form, he does argue that he "never reported improvement of his pain level" and states that "from May 21, 2024 until February 4, 2025, the day of surgery, Plaintiff suffered excruciating pain and limited mobility, which caused atrophy." (*Id.* at 24). Plaintiff further argues that "Defendant knew the extent of Plaintiff's injuries and wanton pain suffered" and "failed to do anything for Plaintiff's shoulder preventing atrophy." (ECF No. 47 at 3).

Plaintiff seems to urge the Court to infer from the request forms that Defendant had knowledge of Plaintiff's pain and was deliberately indifferent to his condition because Plaintiff continued to report pain. However, medical records confirm Defendant saw Plaintiff after each request and acted on the recommended treatment plans of emergency medicine and orthopedic specialists, as described above. For example, in his April 2, 2024 health care request, Plaintiff acknowledges his previous shoulder x-ray was negative for broken bones but requests an MRI

17

because he is "experiencing extreme pain, stiffness, limited rotation and mobility." (ECF No. 47 at 34). Plaintiff states that "my collar bone is poking out of my shoulder and possibly a torn rotator cuff." (*Id.*). Defendant met with Plaintiff on April 17, 2024, and referred Plaintiff to the emergency room at Bakersfield Adventist Health hospital, ordering urgent transfer to a higher level of care. (ECF No. 45-4 at 11, 24). Defendant also ordered an x-ray of Plaintiff's left shoulder. (*Id.* at 22).

In Plaintiff's May 7, 2024 Health Care Request Form, he requested "stronger medication due to my torn AC Joint" and asked when he would be seen for an "MRI appointment that had been set 2 weeks prior." (ECF No. 47 at 36). Plaintiff states he is "experiencing severe pain and stiffness within my left shoulder. I cannot sleep." (*Id.*). Medical record evidence indicates that Plaintiff received an intra-articular steroid injection several days later and then met with Defendant for a follow-up appointment on May 17, 2024. (ECF No. 45-4 at 9). At this visit, Defendant noted in the medical records that Plaintiff was scheduled for an MRI, "which will be done in 5 days…." (*Id.*).

On June 17, 2024, Plaintiff submitted a Health Care Services Request Form noting severe pain, stiffness, and bone grinding on bone. (ECF No. 47 at 38). Plaintiff requested "stronger medication than Naproxin, an over-the-counter medication." (*Id.*). Medical record evidence shows, that on June 28, 2024, Plaintiff met with orthopedic physician, Dr. Bosque, who spoke to Plaintiff about his pain and still recommended a "trial of conservative management" and "physical therapy for rotator cuff rehab and AC separation protocol." (ECF No. 45-7 at 6-8).

On June 30, 2024, Plaintiff submitted a Health Care Services Request Form asking to "be seen by another orthopedic doctor as soon as possible" because Dr. Bosque recommended Plaintiff "attending rehab" and returning after three months. (ECF No. 47 at 40). Plaintiff also requested a "lay-in extension" with another extension requested on September 6, 2024. (*Id.*).

On September 18, 2024, Plaintiff submitted a Health Care Services Request Form. (*Id.* at 44). Plaintiff stated that he is experiencing "severe pain, stiffness, limited mobility within my left shoulder." (*Id.*). He stated that he "has an MRI that shows I need surgery. I need pain medication and surgery." (*Id.*). By September 18, 2024, Defendant had ordered physical therapy and another MRI as recommended by Dr. Bosque. The MRI was performed on September 25, 2024, seven

18

days after Plaintiff's request for health care services. (ECF No. 45-4 at 14-15, 17). Defendant then met with Plaintiff on September 26, 2024 but the visit could not be executed since Plaintiff sued Defendant. (ECF No. 45-4 at 2). Therefore, Plaintiff was referred to another provider. (*Id.*).

Thus, Plaintiff's Health Care Services Request Forms and the medical record evidence do not demonstrate that Defendant was deliberately indifferent to Plaintiff's medical needs. Instead, Plaintiff's opposition disputes the need for physical therapy and requested surgery, but a difference of medical opinion between an inmate and prison medical personnel regarding appropriate medical diagnosis and treatment is not enough to establish a deliberate indifference claim. *Sanchez*, 891 F.2d at 242; *Toguchi*, 391 F.3d at 1058.

Plaintiff also includes two undated photos of unidentified people. (ECF No. 47 at 11). Presuming one of the individuals is the Plaintiff, the Plaintiff provides no further argument as to the significance of the photos in his argument.

Construing the evidence in a light most favorable to Plaintiff, he fails to demonstrate evidence that Defendant subjectively knew and disregarded an excessive risk to Plaintiff's health and safety. Rather, Plaintiff's evidence demonstrates a disagreement with the recommendation of orthopedic specialist, Dr. Bosque, to first pursue a "conservative treatment plan" including physical therapy for three months and a disagreement with the timing of surgery after Defendant stopped treating Plaintiff. This difference of opinion is not a constitutional violation.

Accordingly, Plaintiff has failed to come forth with evidence from which a jury could reasonably render a verdict in his favor on his claim for deliberate indifference to serious medical need in violation of the Eighth Amendment. The Court will recommend that Defendant's motion for summary judgment be granted, and this case be dismissed.[6]

## V.   CONCLUSION AND RECOMMENDATIONS

Based on the foregoing, IT IS RECOMMENDED that:

1.   Plaintiff's motion to strike (ECF No. 46) be **DENIED**.

2.   Defendant's motion for summary judgment (ECF No. 45) be **GRANTED**.

3.   Judgment be entered in Defendant's favor, and that the Clerk of Court be directed to

---

[6] Because the Court finds that this issue is sufficient to resolve the parties' motions, it declines to address the other arguments raised by the parties including whether Defendants are entitled to qualified immunity.

19

close this case.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of Title 28 U.S.C. § 636(b)(l). Within thirty (30) days after being served with these findings and recommendations, any party may file written objections with the Court. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." The objections shall not exceed more than fifteen (15) pages, including exhibits. Any reply to the objections shall be served and filed within thirty (30) days after service of the objections.

The parties are advised that failure to file objections within the specified time may result in the waiver of rights on appeal. *Wilkerson v. Wheeler*, 772 F.3d 834, 838-39 (9th Cir. 2014) (citing *Baxter v. Sullivan*, 923 F.2d 1391, 1394 (9th Cir. 1991)).

IT IS SO ORDERED.

Dated:   **April 24, 2026**                    /s/ Erica P. Grosj

UNITED STATES MAGISTRATE JUDGE

20